In re CONCORDE LIMITED PARTNER-SHIP, and Seminole Ridge Limited Partnership, Debtors.

Jenks C. PARKER and William M. Mabry, Jr., Trustee, Plaintiffs,

v.

CONCORDE LIMITED PARTNERSHIP and Seminole Ridge Limited Partnership, Defendants.

Bankruptcy Nos. 1–86–02022, 1–86–02023.
Adv. No. 1–86–0243.

United States Bankruptcy Court, E.D. Tennessee.

Nov. 25, 1986.

George L. Foster, William M. Foster & Douglas R. Johnson of Hall, Haynes, Lusk and Foster, Chattanooga, Tenn., for plaintiffs.

Kyle R. Weems, of Weill & Weems, Chattanooga, Tenn., for defendants.

## MEMORANDUM

RALPH H. KELLEY, Chief Judge.

The debtor, Concorde Limited Partnership, has one asset, the Concorde apartments. Likewise, Seminole Ridge Limited Partnership owns the Seminole Ridge apartments. The debtors bought the apartments indirectly from the plaintiffs, Parker and Mabry. In this proceeding, Parker and Mabry ask for relief from the automatic stay so that they can foreclose on the apartments.

The plaintiffs, Parker and Mabry, built Seminole Ridge apartments and later Concorde apartments for themselves as investments. They sold the apartment complexes to the debtors in December, 1984. The sales were not made directly to the debtors. The apartments were sold first to U.S. Shelter Corporation which contemporaneously sold them to the debtors. The so-called "wrap-around" deeds of trust were also executed by U.S. Shelter. The effect was to make the debtors owners of the apartments with the obligation to pay the debts under the wrap-around mortgages.

The purchase price of Concorde was about $5,900,000. Concorde was subject to a first mortgage debt of about $2,500,000. The 5.9 million dollars purchase price included the 2.5 million dollar first mortgage debt. The wrap-around mortgage likewise secures the entire debt, including the first mortgage debt. Parker and Mabry were not released and the debtor substituted as the debtor under the first mortgage. Instead, the debtor in effect agreed with Parker and Mabry that it would pay the first mortgage debt directly and the wrap-around deed of trust would secure the payment.

The monthly payment by the debtor on the wrap-around mortgage was to include Parker's and Mabry's first mortgage payment and the payment of interest on the debt to Parker and Mabry. The principal of the purchase price was to be paid by a down payment at closing, a special payment in May, 1985, another special payment in May, 1986, and the balance due within eight years after closing. The special payments were specifically secured by the wrap-around deed of trust.

The sale of Seminole was carried out in the same manner. The purchase price was about $1,761,000. The first mortgage debt was about $600,000.

At the closing in December, 1984, the debtors made a combined down payment of $500,000 which was allocated $386,350 to Concorde and $113,650 to Seminole Ridge. The debtor made these payments with money lent by Pioneer Bank without security.

The debtors made a special payment of $1,000,000 in May, 1985. It was allocated $770,000 to Concorde and $230,000 to Seminole Ridge. Apparently, this money was also borrowed from Pioneer Bank without security.

In February, 1986, Pioneer asked for security on some unsecured debts. Concorde Limited Partnership granted Pioneer a deed of trust of Concorde apartments to secure a debt of $1,303,157. Pioneer also entered into a subordination agreement. It provides that Pioneer will subordinate its mortgage to a later mortgage of up to $850,000.

Another special payment of $300,050 was due in May, 1986. The debtors failed to make this payment. The default led Parker and Mabry to commence foreclosure. A sale was set for September 19, 1986, but on September 18, the debtors filed their

chapter 11 petitions, which automatically stopped the foreclosure.

Neither debtor has missed a monthly payment on the first mortgage. The payments have reduced the principal of the first mortgages some, though the payments are mostly interest at this point. The debtors apparently are not making interest payments to Parker and Mabry but the evidence is not clear.

The parties assert that the debts secured by Concorde are as follows:

|  | Parker & Mabry | Debtor |
| --- | --- | --- |
| Wrap-around | $4,601,000 | $4,577,073 |
| Missed payment | 240,510 | 235,893 |
| Pioneer | 1,300,000 | 1,303,157 |
| TOTAL | $6,141,510 | $6,116,123 |

Parker and Mabry would add to their total a substantial amount in attorneys' fees and interest still accruing on the overdue payment.

The debtor admits that the entire debt to Pioneer is technically secured by the property but would make an allowance for the $850,000 subordination agreement.

The debt secured by the Seminole Ridge apartments is about $1,400,000 which includes the first mortgage debt of $500,000 to $600,000.

Mr. Parker and an appraiser, Mr. Lawrence Reeve, testified on behalf of Parker and Mabry as to the present value of the apartments. The debtors did not dispute Mr. Reeve's expertise. Norman Watson is a general partner in the debtors. He has extensive experience in buying and selling real estate and managing apartments. He testified for the debtors as to the value of the apartments. Their testimony is summarized in the following table:

Value in Millions of Dollars

|  | Parker | Reeve | Watson |
| --- | --- | --- | --- |
| Concorde | $5.1 – 5.4 | $ 5.523 | $5.8 – 6.0 |
| Seminole Ridge | $ 1.5 | $ 1.57 | $1.555 – 1.575 |

In each case Mr. Reeve used three different methods of valuation: (1) cost, (2) market value, and (3) income value. In each case, his final valuation was closest to the investment value which is based on the amount of income the property could reasonably be expected to produce for an investor. In his appraisals he admitted that the market value is usually the most reliable. It was higher as to Concorde—$5,630,000—and lower as to Seminole—$1,533,000. His final estimates leaned toward the income figure because of the strength of the income data.

The witnesses generally agreed that the value of apartment complexes has fallen since the debtors purchased Concorde and Seminole Ridge in December, 1984. They also agreed to a large extent on the causes of the decline in value.

One cause of the decline has been a drop in occupancy rates. A decline in the occupancy rate will cause a decline in the income and thus a drop in the value of apartments as an income-producing investment. One cause of the decline in occupancy rates is the over-supply of apartments in this area. Another cause is the fall in home mortgage interest rates. Payments on home mortgages have become more competitive with rental rates. Both present and would-be renters are choosing to buy houses rather than rent apartments. The appraiser also mentioned the local unemployment rate as a cause of lower occupancy rates.

There was some dispute as to the exact percentages, but the testimony left no doubt that the occupancy rates are down from what they were while Parker and Mabry owned the apartments. Mr. Parker testified that while they owned the apartments the occupancy rate *averaged* 95% and above for both Concorde and Seminole. U.S. Shelter has managed the apartments since the debtors bought them. The local manager, Henry L. Dotson, testified that the occupancy rate since the debtors bought the apartments has averaged about 92%. It has not been 95% or above at Concorde since August, 1985. He agreed that the local oversupply of apartments and the increased competitiveness of home mortgages have driven down the occupancy rates. Nevertheless, he was optimistic that the occupancy rates could be improved to 95% or above.

Concorde has 170 units but only 168 are rentable since two are reserved for management. At the time of the hearing, 25 units were unrented. Twelve were ready to rent but thirteen were not. Seminole has 50 units. At the time of the hearing, five were unrented but they were ready to rent.

There was considerable testimony about maintenance and improvements needed or recommended to bring up the occupancy rates.

Mr. Parker and Mr. Mabry testified that the outside of Concorde needs to be painted. Mr. Dotson, the manager, also testified that the outside needs some painting. He estimated that a complete outside paint job would cost $27,000. Mr. Watson disagreed. He said that the buildings have never been painted and that some people would like the quaint appearance of the unpainted buildings better than painting.

Mr. Dotson also recommended roof repairs, carpet replacement, and new wallpaper at Concorde—if he had plenty of money for improvements and wanted to make Concorde competitive with newer apartments.

He estimated that the cost of replacing some roofs would be about $18,000. Mr. Watson disagreed with the need to replace any roofs. He testified that flat roofs such as these usually are not replaced after only eight years. Flat roofs usually develop leaks, but they are fixed and the roof is not completely replaced until it is about twelve years old.

If he had plenty of money, Mr. Dotson would also replace about fifty carpets at Concorde at a total cost of $40,000. But the replacement of all these carpets is not necessary to make the apartments rentable. He testified that he doesn't have a real carpet problem at Concorde. A few of the thirteen unrented apartments need carpet but not all. He has already replaced some carpets. He has a roll of carpet to replace in a hallway. The replacement of all fifty carpets would simply be a modernization or style-change project.

Mr. Dotson also recommended new wallpaper at Concorde at a cost of $11,250, as one of the optional improvements he would undertake to make Concorde more competitive, if he had the money.

Seminole Ridge is about thirteen years old. Apparently the roof has not been replaced. At the moment all leaks were fixed, but Mr. Dotson recommended replacing roofs at a cost of about $8,000. He also recommended outside painting and cleaning at a cost of $11,000.

Mr. Dotson testified that the present occupancy rates do not produce enough cash flow to undertake major improvements. He does necessary maintenance and improvements as much as the cash flow will allow. He estimates that an occupancy rate of 95% is needed just to make the mortgage payments and meet expenses, though 93% might do it in 1987 according to his projections. He estimated that 97% occupancy is required to produce a return to the owner, after making the present mortgage payments and meeting expenses. These percentages contrast to the average of 92% at best since the debtors acquired the apartments.

Mr. Dotson testified that Concorde made about $60,000 in 1985, but through August, 1986, had lost about $68,000.

He attributed the loss in 1986 to the lower occupancy rate and other causes. Exhibit 19 clarifies his testimony. First, about $28,000 in renovation in 1985 should be subtracted from the 1985 total so that the net cash flow was about $32,000 in 1985, rather than $60,000. Second, there was a shortage in the escrow account for taxes and insurance that is being caught up by payments of $5,200 per month beginning in March, plus a payment of about $8,800 in February. Concorde had paid almost $40,000 of the $60,000 shortage by the end of August and was still making the monthly payments. According to the court's calculations, the shortage should be paid off at the end of this year, but no one testified to that effect. The court hesitates to assume that $5,200 of Concorde's monthly income will become uncommitted and

available for other uses after the first of the year.

Exhibit 19 is a memorandum to Mr. Dotson from one of his employees. It also attributed the 1986 loss to an increase of $2,100 per month ($25,200 yearly) in the regular escrow payments over the 1985 escrow payments.

The 1986 expenses apparently include $11,600 in unpaid bills but the point was not made clear. In any event, Concorde's cash flow has been such that Mr. Dotson has "deferred" payment of these bills.

Mr. Dotson testified that Seminole Ridge lost about $5,500 in 1985 and for 1986 had lost about $7,300 through August. Apparently most of these losses are attributable to a low occupancy rate.

As to both Seminole Ridge and Concorde, Mr. Dotson testified that maintenance expenses could not be cut any more.

There was also considerable testimony about market conditions bringing up the occupancy rate. Generally the testimony dealt with whether or when the oversupply of apartments would be absorbed.

Through much of 1986 Congress considered a major overhaul of the federal income tax law. A reform bill was finally enacted in October. The general provisions will apply to income earned or received and to transactions that take place in 1987, with some exceptions. Apartment complexes will lose some value as tax shelters just as other tax shelter property will lose value. The choice of whether to invest in an apartment complex will (do you believe this?) now depend on its potential for producing a profit rather than a loss or deductions.

Mr. Parker expected this to depress the market value, but the appraiser, Mr. Reeve, would not speculate on this point. He did say that he expected a slow-down in sales while investors adjust to the new law. Mr. Watson testified that prospect of the new law has had a dampening effect on sales, but now that it has been passed, there seems to be a new market among investors who already have large incomes from real estate investments. Apparently they will be less affected by the changes in the law. The point for the moment is that making apartments less attractive as an investment may slow down not only buying but also building, thus allowing some of the oversupply of apartments to be rented.

As to Concorde, it is relatively close to a new shopping mall under construction. The mall will be the largest in the metropolitan area. It will open in late summer, 1987. There are also other developments in the area near the mall. This has the potential to increase the market for apartments in the area. However, industrial development bonds for new apartments in the area, totaling about 300 units, have already been approved.

As to the value of the apartments, the plaintiffs seemed to think it important that the washers and dryers they sold with Concorde have been replaced by rental units. The plaintiffs also proved that Pioneer Bank set off the security deposit account and the debtors have not recovered it. Mr. Dotson testified, however, that U.S. Shelter in effect returns security deposits out of its operating account. Obviously, an entire security deposit account will not be needed at once unless every tenant's lease ends at the same time and they all depart, leaving their apartments sparkling clean and undamaged and no rent unpaid.

Finally, the plaintiffs introduced proof that a foreclosure and sale under the present tax law may be much more beneficial to them than a sale in 1987 under the new tax law. The proof showed, however, that the tax advantages depend on whether the plaintiffs receive cash in 1986 or are willing to pay their taxes as if the full price were paid in cash in 1986. This means a sale for cash by the end of the year, or if the plaintiffs take promissory notes as payment, they will have to sell the notes for cash by the end of the year or treat the gain as received completely in 1986 and pay the tax even though they will not have been paid in full. Otherwise, the payments from the new buyers will be made after the new law takes effect and will be taxed accordingly.

Mr. Watson testified that the apartments are necessary for an effective reorganization because they are the debtors' only assets. He expects the debtors to file plans within the 120–day period during which only the debtors can file a plan. 11 U.S.C. § 1121. The period expires shortly after the beginning of 1987. As to what a plan might provide, he testified, that there seems to be a market developing among people who already have substantial income from real estate investments. Now that the new tax law is passed it no longer prevents investment simply because of uncertainty. As a result, it may be possible to sell the property. Another possibility is bringing in another partner in return for an ownership interest. The added money apparently would be used to make improvements to increase the occupancy rate.

The automatic stay of § 362 can be lifted for cause, including (1) lack of adequate protection of the creditor's interest in the property, and (2) the debtor has no equity in the property and it is not necessary for an effective reorganization. 11 U.S.C. § 362(d). The plaintiffs have the burden of proof on the question of equity and the debtors have the burden of proof on the other issues. 11 U.S.C. § 362(g). The issue of whether property is necessary for an effective reorganization includes the question of whether there is a reasonable likelihood of rehabilitation. The debtor has the burden of proof on this issue.

The proof did not show that a present lack of maintenance at either Concorde or Seminole Ridge is causing a decline in value. The evidence did not show that there is work which absolutely must be done in the near future, in order to maintain the value of the apartments, but cannot be done because of lack of money.

The effect of the new tax law on the value of the apartments is too uncertain for the court to conclude that it will cause a decline in value.

The proof that the debtors no longer own the washers and dryers is barely material. Not owning the washers and dryers has apparently had a negligible effect on the apartments' value. The decision to change to a rental system was not shown to be a bad management decision. It does not show that the debtors' management or attitude toward maintenance may cause a decline in value. The loss of the security deposits is unconvincing for the same reasons.

The plaintiffs argue that adequate protection requires the payment of interest not only on the first mortgage debt but also on their secured debt as compensation for lost opportunity cost or the time-value of money. The theory is that the automatic stay causes a secured creditor to lose the income that could be earned on the proceeds of foreclosure if there were no stay or if the stay were lifted. Payment of such interest would preserve the value of the collateral to the secured party as of the time it could have received the proceeds from a foreclosure sale. In the well known *American Mariner* decision, the ninth circuit court of appeals required the payment of lost opportunity cost as part of adequate protection. *In re American Mariner Industries, Inc.*, 734 F.2d 426, 10 Coll.Bankr. Cas.2d 910 (9th Cir.1984); accord *Grundy Nat'l Bank v. Tandem Min. Corp.*, 754 F.2d 1436, 12 Coll.Bankr.Cas.2d 254 (4th Cir.1985). The eighth circuit has held that payment of lost opportunity cost may be required depending on the facts of the case. *In re Ahlers*, 794 F.2d 388, 14 Bankr.Ct.Dec. 768, 15 Coll.Bankr.Cas.2d 111 (8th Cir.1986); *In re Briggs Transportation Co.*, 780 F.2d 1339, 14 Bankr.Ct.Dec. 48, 13 Coll.Bankr.Cas.2d 1289 (8th Cir. 1985). The fifth circuit has granted an en banc rehearing of a decision that payment of lost opportunity cost cannot be required as part of adequate protection. *In re Timbers of Inwood Forest*, 793 F.2d 1380, 14 Bankr.Ct.Dec. 1029 (5th Cir.1986) reh. en banc granted 802 F.2d 777 (5th Cir.1986).

This court does not believe that lost opportunity cost is always required for adequate protection. Indeed, the payment of lost opportunity cost should rarely be required, if ever. The court sees no special

circumstances in this case that call for the payment of lost opportunity costs.

The plaintiffs' argument that a delay in foreclosure will cost them much more in federal income taxes is the lost-opportunity-cost argument taken a step further. Changes in the tax laws are not the fault of the automatic stay. Furthermore, as a factual matter, the prospective loss is too speculative to make a difference. The best that can be said is that a foreclosure and sale this year may possibly, if everything goes right, save the plaintiffs some taxes.

Having eliminated the unconvincing arguments, the court comes to the difficult questions, but they involve not only adequate protection but also the other issues as to relief from the automatic stay— whether the debtors have equity in the property and whether they have a reasonable likelihood of rehabilitation.

Seminole Ridge presents the easier questions. Since the debtor is making the first mortgage payments, interest on the first mortgage is not reducing the value that is available to secure the purchase money debt to the plaintiffs. The debtor is also current on escrow payments for taxes and insurance. The court generally accepts the value of the property as set by the plaintiffs' appraiser at $1,570,000. The value may be slightly more or slightly less, but the appraisal is acceptable. It basically agrees with Mr. Watson's high estimate, which was $5,000 more. The appraiser's valuation exceeds the total secured debt, thereby leaving an equity cushion that may adequately protect the plaintiffs' interest for the moment. This relatively small equity cushion cannot, however, protect the plaintiffs' interest for long.

This brings the court to the question of the likelihood of rehabilitation. Seminole Ridge is much nearer to profitability than Concorde. It should also be easier to raise the occupancy rate, since all the apartments are ready to rent. Apparently there are fewer maintenance problems. The recommended improvements (roofing and painting) would cost only about $20,000. Of course, this amount could essentially be treated as more secured debt that reduces the equity cushion. Certainly the need for the work must be considered in determining whether or how long the automatic stay can be continued. A sale of Seminole Ridge with other properties or by itself appears to be possible and should produce enough to pay the plaintiffs' debt. Additional borrowing to make improvements or otherwise raise the occupancy rate is unlikely, but bringing in new investor-owners might be. Considering the present value of the debtor's interest, the amount of additional money needed at the moment, and the value compared to the secured debt, the apartments could be a good investment for an investor or buyer who likes risk but not too much. The payback, if any, might be some time in coming. The court is not inclined to lift the stay at this time. The debtor should be given an opportunity to propose a plan that will have effect without much delay. The plaintiffs, of course, are free to raise the issues again if the debtor delays too long. The court will deny lifting of the stay, without dismissing the complaint, which will remain pending.

The plaintiffs have also failed to prove lack of adequate protection of their lien on Concorde. As a practical matter, the plaintiffs are the holders of a second mortgage. The debtor has not missed any payments on the first mortgage or on insurance and taxes. Thus, interest on the first mortgage and accruing taxes are not reducing the value of the property available to secure the debt to the plaintiffs. The plaintiffs are not being forced to pay insurance and there is no lack of insurance to protect the property. Accepting the appraiser's valuation of $5,523,000, the property has considerable value over the first mortgage debt and the second mortgage debt to the plaintiffs. Of course, there is interest still accruing on the debt to the plaintiffs but the evidence was not clear as to how fast it is eating into the value of the property above the debt to the plaintiffs. According to the court's rough estimates, it will take several months for the accruing

interest to completely erode the value above the first and second mortgage debts, much longer than the time needed for the debtor to propose a plan and have it confirmed or for the plaintiffs to renew their request for relief from the stay.

Obviously, the accruing interest is reducing Pioneer Bank's security, but Pioneer is not the party seeking relief from the stay.

■ The plaintiffs attempted to reduce the equity cushion by adding to their secured debt attorneys' fees of up to $100,000. Before the debtor filed its chapter 11 petition, the plaintiffs not only commenced foreclosure but also had a receiver appointed. The debtor suggested that appointment of the receiver was obtained without notice to the debtor and was unjustified in light of the facts at the time. Foreclosure can be more complex than usual with a valuable property such as Concorde, but it is difficult to imagine it justifying a fee of nearly $100,000. Furthermore, the court has pointed out before that the attorney's fee which can be added to a secured claim under § 506(b) is what the bankruptcy court determines to be a reasonable fee as a matter of federal law. 11 U.S.C. § 506(b). State rules or rules of thumb do not control. The claim for a large amount of attorneys' fees was not proven.

The court concludes that the stay should not be lifted because of lack of adequate protection.

■ Even by its own estimates, the debtor does not have any equity in Concorde above the total secured debt, including the debt to Pioneer. The debtor argues that the subordination agreement with Pioneer Bank somehow reduces the secured debt to Pioneer. The court does not agree. The subordination agreement merely allows the debtor to substitute another lender for Pioneer as third mortgagee up to the amount of $850,000. Adding a new third mortgage debt might make Pioneer unsecured simply because of the value of the property. But if there were value above the new third mortgage debt, it would be subject to Pioneer's lien. Thus, the subordination agreement does not create any equity for the debtor.

This brings the court to the real question in this case, whether Concorde has a reasonable prospect of rehabilitation.

There are basic facts, some of questionable relevance, that the court cannot ignore. If the plaintiffs are allowed to foreclose, they will have the property back after the debtor has paid them $1,000,000 and kept the first mortgage debt current. The plaintiffs should be able to resell the property for not much less than the price to the debtor, or the plaintiffs can again operate Concorde as their own, which they should be able to do at a profit. The plaintiffs may be required to invest some money, perhaps as much as $100,000 for improvements, and in a foreclosure, Pioneer may force the plaintiffs to pay it the secured portion of its debt. But the plaintiffs should still be able to make a profit by selling or operating the apartments. Even with the increased taxes that the plaintiffs say will result from a delayed foreclosure, the court is hardpressed to see how a short delay in foreclosure will greatly harm the plaintiffs.

On the other hand, the $1,000,000 paid by the debtor apparently came from Pioneer Bank. The first mortgage payments came from the rent generated by Concorde. The debtor has incurred a debt to Pioneer Bank, but it has spent none or very little of its own money in acquiring Concorde, compared to its value. Of course, if the debtor by some feat of marketing can make Concorde profitable after payments on the wraparound mortgage, it may be able to make payments to Pioneer, much to the benefit of the debtor's general partners.

With these facts in mind, the court turns to the prospects of rehabilitation.

The court believes that Mr. Watson's valuation of Concorde at $6,000,000 is more than it would bring if sold now. It would probably bring a sale price between the plaintiffs' appraisal at $5,523,000 and $5,800,000 or a little more. A sale in this price range will not produce any money for

the debtor. It will go to the secured creditors.

There may be an investor somewhere who is interested in risking up to $100,000 to make the improvements that may bring up the occupancy rate. The investor would have to be willing to wait a long time for its return. The investment, however, would probably add to the secured debt, or if the investor took an ownership interest, it would probably demand all the debtor's interest, rather than a part interest.

The debtor's interest surely is not worth much at the moment. The apartments are not generating enough income to make payments on both the first mortgage debt and the debt to the plaintiffs, and Pioneer's mortgage debt remains after those. The apartments are unlikely to generate enough income without the investment in improvements and maintenance, and the debtor doesn't have the money to do it. Even with the improvements, the average occupancy rate may not be raised enough to produce income above the first and second mortgage payments. An increase in the occupancy rate due to market forces is too speculative to be given much weight. Furthermore, any such increase will probably be many months, if not years, in coming. Thus, a potential investor could reasonably demand that the debtor sell all its interest in return for a commitment of funds to make the needed improvements.

■ A reasonable likelihood of rehabilitation or reorganization does not mean that the debtor must itself have a prospect of continuing the business under a confirmed plan. The point is to continue the business, not necessarily the debtor's ownership. Buy-out cases or plans are not unusual. They are not unheard of in cases like this, in which the debtor is really attempting to deal only with secured creditors. The problem here is Concorde's burden of secured debt in a slack market for apartment rentals. Even with all the suggested improvements, it will be hard to generate income above the first and second mortgage payments. Furthermore, even though the debtor has not foregone required mainte-

nance, continuation of the business in the present circumstances makes lack of required maintenance a definite risk in the future.

Mr. Watson's testimony concerning a sale or bringing in new investors did not reveal any definite prospects or a strategy aimed at rehabilitation. If the plaintiffs are allowed to foreclose, they can protect themselves and the new owners from a repeat of the present situation.

■ The debtor raised the prospect of avoiding Pioneer's mortgage lien as a preferential transfer. This would produce equity in the property for the debtor. It could borrow against the equity to make the needed improvements, but as the court has pointed out, there would still be great difficulty in operating the apartments for anything more than payments on the first mortgage and to the plaintiffs. Moreover, Pioneer's mortgage lien is not clearly avoidable. Avoidance would depend on whether Pioneer was an "insider". 11 U.S.C. § 547(b)(4)(B) & § 101(28). This is more speculation than a reasonable prospect of rehabilitation.

■ The debtor has failed to carry the burden of proof on the issue of whether it has a reasonable likelihood of rehabilitation. The court will enter an order lifting the stay as to Concorde.

■ The plaintiffs claim that they have a lien on the rent and that it is not being adequately protected. The court need not decide whether the plaintiffs do in fact have a lien on the rent. As to Concorde, the question need not be addressed since the court will lift the stay on other grounds. As to Seminole Ridge, neither the proof nor the argument showed a lack of adequate protection of a lien on the rent. The statute gives the debtor the burden of proof on all issues except equity, but this does not mean that a creditor need only incant the words "lack of adequate protection" in order to have the stay lifted. The proof did not show any drop in the average amount of rent received after filing the chapter 11 petition, compared to what was

received before. The proof did not show the likelihood of such a drop in the near future. But the proof did show that the debtor is using the rent in the normal course of business to pay the first mortgage payment, the tax and insurance escrow, and the costs of necessary maintenance. The lien on rent, if there is one, is adequately protected since the status quo is being maintained. 2 L. King, Collier on Bankruptcy § 361.01[5] (15th ed. 1986).

This memorandum constitutes findings of fact and conclusions of law. Bankruptcy Rule 7052.